UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ANNE B. WIGHTMAN, <br><br> Plaintiff, <br><br> v. <br><br> SECURIAN LIFE INSURANCE CO., <br><br> Defendant. | Civil Action No. 18-11285-DJC |

## MEMORANDUM AND ORDER

CASPER, J.  April 8, 2020

### I. Introduction

Plaintiff Anne Wightman ("Ms. Wightman") has filed this lawsuit against Defendant Securian Life Insurance Company ("Securian") alleging the unlawful denial of benefits in violation of the Employee Retirement and Income Security Act ("ERISA"), 29 U.S.C. § 1132(a)(1)(B), after the death of her husband, Dr. Colin Wightman, D. 1. Ms. Wightman and Securian have each moved for summary judgment. D. 60; D. 63. For the reasons stated below, the Court DENIES Ms. Wightman's motion, D. 60, and ALLOWS Securian's motion, D. 63.

### II. Factual Background

Unless otherwise noted, all facts are undisputed.[1]

---

[1] Undisputed facts drawn from the administrative record, filed at D. 25, are numbered SECURIAN-000001 to SECURIAN-000778, CERTIFICATE-0000001 to CERTIFICATE-0000034, and POLICY-000001 to POLICY-000188.

A.  **The Plan**

Dr. Wightman was employed by Amazon and enrolled through his employer in a Securian group insurance policy. D. 62 ¶ 1; D. 67-1 ¶ 1; POLICY-000001-188. Dr. Wightman was enrolled in $300,000 of basic life coverage, $300,000 of supplemental life coverage, $300,000 of accidental death and dismemberment coverage ("Accidental Death" policy) and $300,000 of supplemental accidental death and dismemberment coverage. D. 63 at 4; SECURIAN-000001. The Accidental Death policy is the subject of this suit and states that it is "limited coverage." POLICY-000017. The Accidental Death policy explains that 'limited coverage' "means this coverage will provide benefits only when loss, death or dismemberment results, directly and indirectly from all other causes, from an accidental bodily injury which was unintended, unexpected and unforeseen." POLICY-000017. The Accidental Death policy expressly excludes accidental death or dismemberment coverage when caused "directly or indirectly" by several conditions including: "suicide or attempted suicide, whether sane or insane . . . intentionally self-inflicted injury or attempt at self-inflicted injury, while sane or insane" and "bodily or mental infirmity, illness or disease . . . ." POLICY-000017.

B.  **Dr. Wightman and Asphyxia**

Sometime in the 1990s, Dr. Wightman began spending time in internet chat rooms speaking with individuals who were interested in asphyxia. D. 63 at 7; SECURIAN-000352, 501, 528, 614. In the late 1990s, Dr. Wightman sought therapy for his sexual behavior. D. 63 at 8; SECURIAN-000352. Dr. Wightman told his wife Ms. Wightman about his interest in "sex-related strangulation" in 2007 after he engaged in a sexual encounter that led to a complaint to the police and Dr. Wightman losing his job. D. 63 at 7; SECURIAN-000348-49. Dr. Wightman sought mental health treatment from June 2007 until April 2010. D. 63 at 8; SECURIAN-000352, 520-

50. Records from this treatment note Dr. Wightman as having "high risk sexual behavior [that] has led to possibility of charges for sexual assault." SECURIAN-000523. Dr. Wightman was prescribed citalopram for compulsive thinking around 2008 which he took until 2015. SECURIAN-000353.

### C. Dr. Wightman's Death

On October 17, 2016, Dr. Wightman died in his apartment in Quincy, Massachusetts. D. 62 ¶ 2; D. 63 at 2. Ms. Wightman, Dr. Wightman's wife of thirty-two years, arrived at the apartment at 10:00 p.m. and found Dr. Wightman in the bathroom, naked and unmoving. D. 62 ¶ 3; D. 63 at 2. At the time of this discovery, he had a belt looped around his neck that was suspended over the top of the bathroom door. D. 62 ¶ 3; D. 63 at 2. When Ms. Wightman opened the bathroom door, Dr. Wightman fell to the floor. D. 62 ¶ 4; D. 63 at 3.

Ms. Wightman called 911. D. 62 ¶ 5; D. 63 at 3. The police and paramedics arrived and the police conducted an investigation. D. 63 at 3; SECURIAN-000091-93. An officer reviewed Dr. Wightman's cell phone and found a recent chat discussing autoerotic asphyxiation with a belt. D. 62 ¶ 8; D. 63 at 3-4. The officer also observed Dr. Wightman lying naked, face up on the bathroom floor next to the belt. D. 62 ¶ 6; D. 63 at 4; SECURIAN-000093. The first responding officer removed the belt and initiated chest compressions. D. 62 ¶ 6; D. 64 at 4; SECURIAN-000092. Another officer noted a black mark on the trim above the bathroom door which was consistent with a mark left by laying a belt over the top of the door and closing the door. D. 62 ¶ 7; D. 63 at 4; SECURIAN-000093. The medical examiner determined Dr. Wightman's cause of death to be an "accident" attributed to "autoerotic asphyxiation (hanging)." D. 62 ¶ 9; D. 67-1 ¶ 9.

3

At the time of his death, Ms. Wightman, was unaware of whether Dr. Wightman had engaged in autoerotic asphyxiation aside from the event that led to his death. D. 63 at 7; SECURIAN-000349. According to Ms. Wightman, prior to his death Dr. Wightman had a positive outlook on his life; he had made future plans including a job interview and a planned weight loss surgery. D. 62 ¶ 18; D. 67-1 ¶ 18; SECURIAN-000155-58.

**D.   The Claim**

On November 23, 2016, Ms. Wightman submitted a claim under Dr. Wightman's Securian policy. D. 62 ¶ 14; D. 67-1 ¶ 14. On December 6, 2016, Securian paid Ms. Wightman $600,000 in benefits under the basic and supplemental life coverage, D. 63 at 5; SECURIAN-000006-07, but, on February 14, 2017, denied Ms. Wightman's claim for accidental death based on the policy's exclusion for intentional self-inflicted injury or attempt at self-inflicted injury, and because the death "in this manner would not be deemed unintended, unexpected and unforeseen," SECURIAN-000098-99; D. 62 ¶ 15; D. 63 at 5.

On April 17, 2017, Ms. Wightman appealed Securian's denial and submitted supporting evidence and expert material. SECURIAN-000133-241; D. 62 ¶¶ 16-17; D. 67-1 ¶¶ 16-17. These submissions included: her personal declaration detailing her relationship with Dr. Wightman, a case evaluation, dated April 14, 2017, of Dr. Richard Krueger, relevant medical literature identified by Dr. Krueger, photographs of the bathroom where Dr. Wightman was found and various other articles and law regarding autoerotic asphyxiation, sexual masochism and paraphilic disorders. SECURIAN-000133-490.

As part of the case evaluation, Dr. Krueger opined that Dr. Wightman was psychologically healthy, unstressed, without any interest in or tendency toward suicidal or self-harming activities. D. 62 ¶ 20; D. 67-1 ¶ 20. Dr. Krueger opined that "[t]he restriction in blood flow that occurs as a

result of autoerotic hypoxia typically results in no injury to the brain or other parts of the body, nor is bruising or tissue damage a likely result." SECURIAN-000354. Dr. Krueger explained that "[t]he light-headedness that occurs as a result of such activity is a reversible change (akin to body temperature or blood pressure), and is not in and of itself an injury to the body." SECURIAN-000354. Dr. Krueger further opined that, because Dr. Wightman was practicing autoerotic asphyxiation when he died, he was pursuing pleasure and not attempting to harm himself. SECURIAN-000355.

On April 22, 2017, Ms. Wightman submitted supplementary material in further support of her appeal including an independent medical opinion from Dr. Jennifer Hammers, a forensic pathologist and a Deputy Chief Medical Examiner for New York City, and formerly a medical examiner in Massachusetts. D. 62 ¶ 23; D. 67-1 ¶ 23; SECURIAN-000497-516. Dr. Hammers opined that Dr. Wightman had engaged in the act that led to his death for the purpose of sexual gratification and with the expectation of temporary non-injurious changes to enhance his sexual gratification. D. 62 ¶ 24; D. 67-1 ¶ 24; SECURIAN-000500. Dr. Hammers explained that autoerotic asphyxia "is an act of an individual placing a device . . . in or over the nose, mouth, head and/or neck with the purpose of temporarily decreasing oxygen supply to the brain to increase self-simulated sexual pleasure." SECURIAN-000502. Dr. Hammers described the body's response to asphyxia as caused:

> from decreased amounts of oxygen (hypoxia) or lack of oxygen (anoxia). The brain is particularly sensitive to oxygen and often is the most affected organ. Hypoxia and anoxia can lead to neurological symptoms and even loss of consciousness. Restoration of adequate oxygen supply to the brain after only a brief hypoxic/anoxic period (seconds) will result in return of consciousness and resolution of symptoms without injury to the brain or other parts of the body. Restoration of adequate oxygen supply to the brain after longer periods may result in resolution of symptoms but may also lead to temporary or long-term impairments. If the brain is without adequate oxygen for a prolonged period of

5

time (minutes) a person may experience permanent damages to the brain tissue from which they will not fully recover or may die.

SECURIAN-000501-02.

Dr. Hammers described the incidence of autoerotic deaths as "very low and estimated to be approximately 0.5 deaths per million persons per year." SECURIAN-000502. Her opinion did not include statistics of the rate of death for those who participate in autoerotic asphyxiation. SECURIAN-000502.

### E. Appeal Denial

On August 16, 2017, Securian denied Ms. Wightman's appeal concluding that the death did not qualify under the definition of coverage and fell under two policy exclusions: the "self-inflicted injury" exclusion and the injury caused by "mental infirmity, illness or disease" exclusion. D. 62 ¶ 25; D. 67-1 ¶ 25. The denial letter cited various factors and evidence it considered including: a) Dr. Shapland's review which concluded that "[Dr.] Wightman intended to cause hypoxia in himself and that causing hypoxia in oneself is causing self-harm or self-injury regardless of intent;" b) an opinion Securian obtained from Dr. Reade who opined that Dr. Wightman met the diagnostic criteria for a psychiatric disorder at the time of his death and recovery under the Accidental Death policy was precluded pursuant to the mental illness exclusion; c) Dr. Wightman's psychologist's notes which observed that Dr. Wightman "had 'been spending [a] considerable amount of time in internet chat rooms . . . he expressed concerns about his behavior and some recognition that it was high risk in terms of his own safety,'" d) the statistic that autoerotic asphyxiation leads to 62-155 deaths per year. SECURIAN-000741-42. The letter explained that this information led Securian to conclude that, although Dr. Wightman "may not have intended or expected death, death is not unforeseen," and that the injury did not occur directly

and independently of all other causes from an injury that was unintended, unexpected and unforeseen." SECURIAN-000741-42.

On September 12, 2019, Ms. Wightman supplemented the administrative record to include Dr. Krueger's response to Dr. Reade's assessments. D. 59-1. Dr. Krueger opined that Dr. Reade had incorrectly concluded that Dr. Wightman's death was caused by a mental illness or infirmity. D. 59-1 at 3-4. Dr. Krueger also contested Dr. Reade's assessment that death was caused by a self-inflicted injury. D. 59-1 at 1-2.

### III. Procedural History

Plaintiffs instituted this action on June 19, 2018. D. 1. The parties each now move for summary judgment. D. 60; D. 63. The Court heard the parties on the pending motions and took these matters under advisement. D. 68.

### IV. Discussion

#### A. **Standard of Review**

In an ERISA benefits case, "where review is based only on the administrative record before the plan administrator . . . summary judgment is simply a vehicle for deciding the issue." Orndorf v. Paul Revere Life Ins. Co., 404 F.3d 510, 517 (1st Cir. 2005). The Court "sits more as an appellate tribunal than as a trial court" and "evaluates the reasonableness of an administrative determination in light of the record compiled before the plan fiduciary." Leahy v. Raytheon Co., 315 F.3d 11, 18 (1st Cir. 2002). "[A] denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989). "[D]*e novo* review generally consists of the court's independent weighing of the facts and opinions" in the administrative record

to determine whether the evidence supports the administrator's decision. Orndorf, 404 F.3d at 518. There is no dispute that this Court should apply *de novo* review here. D. 63 at 11-12; D. 61 at 7.

### B. The Accidental Death Policy

ERISA "supersede[s] any and all State laws insofar as they may now or hereafter relate to any employee benefit plan" covered by ERISA. 29 U.S.C. § 1144(a). "Congress enacted ERISA to protect the interests of employee benefit plan participants and their beneficiaries." United Elect., Radio and Mach. Workers of Am. v. 163 Pleasant St. Corp., 960 F.2d 1080, 1092 (1st Cir. 1992). In enacting ERISA, Congress "expected that a 'federal common law of rights and obligations under ERISA-regulated plans would develop.'" Todd v. AIG Life Ins. Co., 47 F.3d 1448, 1451 (5th Cir. 1995) (citing Pilot Life Ins. Co. v. Dedeaux, 481 U.S. 41, 56 (1987)). The policy language—both the benefit provision and the exclusion provision—must be "interpreted under principles of federal substantive law" using "canons of contract interpretation." Wickman v. Nw. Nat'l Ins. Co., 908 F.2d 1077, 1084 (1st Cir. 1990) (citing Pilot Life Ins. Co., 481 U.S. at 56-57).

Although the insured (or, as here, the beneficiary of the insured) has the initial burden of proving that the benefit is covered, the insurer must prove the "applicability of exclusions." Glista v. Unum Life Ins. Co., 378 F.3d 113, 131-32 (1st Cir. 2004). Here, the parties dispute both whether death by autoerotic asphyxiation is covered under the policy and whether any exclusion applies. D. 63 at 12-20; D. 61 at 10-20. Courts grappling with autoerotic asphyxiation and accidental death insurance decline any "*per se* rule on insurance coverage for autoerotic asphyxiation . . . because the policy language and factual circumstances involved in a death can vary, sometimes greatly." Tran v. Minn. Life Ins. Co., 922 F.3d 380, 386 (7th Cir. 2019). Analysis of coverage and the

8

exclusions, therefore, must account for both the specific policy language and the factual scenario at issue. See id.

The policy at issue here, Dr. Wightman's Accidental Death policy, allows recovery for accidental death narrowly defined. POLICY-17. Neither party here contends that Dr. Wightman's death was a suicide, nor argues that Dr. Wightman intended his own death in this instance. D. 62 ¶ 13; D. 67-1 ¶ 13. Similarly, the Massachusetts office of Chief Medical Examiner and the State police investigation determined Dr. Wightman's death was an "accident" attributed to "autoerotic asphyxiation (hanging)." D. 62 ¶ 9; D. 67-1 ¶ 9. Such a determination, however, does not mandate recovery under the Accidental Death policy; instead, recovery depends upon the specific policy language and factual circumstance. See Tran, 922 F.3d at 386 (observing that even assuming the decedent's death was accidental, because of the terms of the policy, the beneficiary was not entitled to recover under the policy). "[T]he first place to look for a definition is in the terms of the policy contract itself," Wickman, 908 F.2d at 1084, and here the Accidental Death policy, on its terms, is limited.

### 1. Dr. Wightman's Death Was Not an Accidental Bodily Injury Covered Under the Policy

Turning first to whether Dr. Wightman's death is covered under the policy, the policy coverage applies to accidental injury "only when your loss, death or dismemberment results . . . from an accidental bodily injury which was unintended, unexpected and unforeseen." POLICY-17. Securian argues that Dr. Wightman's death was not covered under the policy because it was not unintended, unexpected or unforeseen that Dr. Wightman would suffer injury from putting a belt around his neck and restricting blood flow to his brain. D. 63 at 12. Ms. Wightman argues that because public investigators determined Dr. Wightman's death an accident, it is covered under the Accidental Death policy. D. 61 at 2. As discussed above, however, this determination is not

9

dispositive of whether the incident is an accident within the policy terms. This Circuit has adopted a subjective/objective test to determine whether a death constitutes an accident under accidental death insurance policies. Wickman, 908 F.2d at 1088 (explaining that the fact-finder must first determine the insured's expectations and then "whether the suppositions which underly that expectation were reasonable"); McGillivray v. Life Ins. Co. of N. Am., 519 F. Supp. 2d 157, 163 (D. Mass. 2007) (describing the First Circuit's Wickman decision as crafting a "subjective/objective test to be used in determining what constitutes 'accidental' death").

Courts apply Wickman in a three-part test. Id. First, the inquiry considers the expectation of the insured, and second, if the insured did not expect the type of injury similar in type or kind to that suffered, the inquiry asks whether the insured's expectation was reasonable. Id. In other words, for Dr. Wightman's death to be covered under the policy, the beneficiary must demonstrate that the insured did not expect an injury similar in type or kind and that the suppositions underlying this expectation were reasonable. Id. Lastly, "if it is determined that the insured's subjective expectation is simply unknowable based on the available evidence, the fact-finder must turn to "an objective analysis of the insured's expectations." Id. (citations omitted) (internal quotations omitted). Reaching the third part of the inquiry is unnecessary here, where the decedent's expectation of survival is undisputed. D. 62 ¶ 13; D. 67-1 ¶ 13.

Turning first to the subjective prong, the record supports the inference that Dr. Wightman did not expect to experience injuries in the type he actually experienced. Securian asserts that Dr. Wightman "intended to commit autoerotic asphyxiation" and, therefore, loss of oxygen cannot be considered unexpected, unintended or unforeseen. D. 63 at 13. The inquiry under Wickman, however, is whether the insured intended an injury "similar in type or kind" to that which he suffered. Wickman, 908 F.2d at 1088. Here, Dr. Wightman intended asphyxiation, but did not

10

intend death, D. 62 ¶ 13; D. 67-1 ¶ 13, even so, such loss of oxygen and death was not unexpected, unintended or unforeseen under the policy because Dr. Wightman's expectation was not reasonable.

Second, for Ms. Wightman to recover under the Accidental Death policy, she must also demonstrate that this expectation was reasonable. Wickman, 908 F.2d at 1088. Courts have recognized the reasonable aspect of the Wickman framework to reflect the rationale that "at some point the high likelihood of risk and the extensive degree of harm risked, weighed against the lack of social utility of the activity, become not marginally but so overwhelmingly disproportionate that the resultant injury may be outside a definition of 'accidental' that is not unreasonably narrow." Stamp v. Metro. Life Ins. Co., 531 F.3d 84, 93 (1st Cir. 2008) (quoting Lennon v. Metro. Life Ins. Co., 504 F.3d 617, 623 (6th Cir. 2007)) (internal quotations omitted). This requires the Court to consider whether the suppositions underlying this expectation were reasonable. McDonough v. Fed. Ins. Co., No. 11-CV-11022-RWZ, 2012 WL 4060564, at *2 (D. Mass. Sept. 14, 2012). When considering the reasonableness of the decedent's expectation of survival, courts review the decedent's experience with autoerotic asphyxiation and the safety mechanism in place. See Critchlow v. First UNUM Life Ins. Co. of Am., 378 F.3d 246, 260-61 (2d Cir. 2004) (noting the safety mechanism and the decedent's experience when considering reasonableness); Lonergan v. Reliance Standard Life Ins. Co., No. 96-CV-11832-PBS, 1997 WL 34706253, at *6-*7 (D. Mass. May 29, 1997) (same).

Here, although the record supports the notion that Dr. Wightman was long interested in autoerotic asphyxiation, Securian-000170, the record does not suggest that Dr. Wightman was an experienced practitioner and, in this instance, he engaged in the activity without safety mechanisms that would reasonably assure his safety. Ms. Wightman contends that Dr. Wightman was

11

positioned so that, had Dr. Wightman remained conscious, he "could have ended the autoerotic asphyxiation activity by straightening his legs and standing up fully or by pushing down on the bathroom door latch which releases easily." D. 61 at 4. Whether the safety mechanism works while unconscious, affects the reasonableness of the expectation, see Critchlow, 378 F.3d at 260-61 (holding that the insured's expectation of survival was objectively reasonable because he was experienced and had set up an elaborate "escape mechanism designed to save him if he began to lose consciousness"); Lonergan, 1997 WL 34706253, at *6 (holding that the insured's expectation of survival was not reasonable because his escape mechanism "was only effective as long as he remained conscious"), and here, the mechanism Dr. Wightman used works only insofar as the person remains conscious because it requires the person to straighten his legs and fully stand up. D. 61 at 4; SECURIAN-000502.

In Lonergan, another session of this Court (Saris, J.) distinguished the escape mechanism the decedent used from ones designed to release if the user becomes unconscious. 1997 WL 34706253, at *6. In making this distinction, the Court explained that the decedent "could not reasonably expect" his safety mechanism to work in the event he lost consciousness and therefore found the death was not an accident within the meaning of the policy. Id. at *6-*7. Similarly, Dr. Wightman's expectation of survival without an escape mechanism designed for the event of unconsciousness, was not reasonable when he practiced autoerotic asphyxiation to the point of unconsciousness.

Ms. Wightman further asserts that, because deaths from autoerotic asphyxiation are between 62-155 deaths per a year, the risk presented is "very low" and, therefore, Dr. Wightman was reasonable in not expecting the type of injury he sustained. D. 61 at 11. This Circuit has rejected statistical arguments about the reasonableness of the insured's expectation of survival

when they deliberately engaged in mortally risky behavior. See Stamp v. Metro. Life Ins. Co., 466 F. Supp. 2d 422, 432-33 (D.R.I. 2006) (rejecting the argument that death is statistically relatively uncommon for drunk drivers in light of the decedent's blood alcohol level at the time of death and holding that a "reasonable person of similar background and characteristics would have viewed [the decedent's] conduct as highly likely to result in a fatal injury"), aff'd, 531 F.3d 84 (1st Cir. 2008). As the First Circuit explained, although one who plays Russian roulette would have a "decent chance, statistically speaking, of not being injured," nonetheless, the death would not be considered an accident because "the mortal risk associated with playing Russian roulette is patently obvious . . . ." Stamp, 531 F.3d at 93-94. As is the case here where, although the record indicates that more people may practice methods of autoerotic asphyxiation without incident, Dr. Wightman had no means to control the pressure on his neck and escape serious injury or death once unconscious and "[o]ne who purposefully creates the conditions of risk foresees the logical consequence of risk, and has to assume that he may not be able to manage those conditions so as to eliminate the risk he has created." Cronin v. Zurich Am. Ins. Co., 189 F. Supp. 2d 29, 37 (S.D.N.Y. 2002). As such, Dr. Wightman's death cannot be said to have resulted from an "accidental bodily injury which was unintended, unexpected and unforeseen," POLICY-17, under this Circuit's standard.

2. *The Intentional Self-Inflicted Injury Exclusion Also Precludes Coverage*

The Accidental Death policy also includes an exclusion for death caused by intentional self-inflicted injury which specifically provides that death caused "directly or indirectly by . . . . intentionally self-inflicted injury or attempt at self-inflicted injury" are excluded from coverage under the policy. POLICY-17. Securian argues, in the alternative, that the self-inflicted injury policy exclusion precludes coverage because autoerotic asphyxiation is a self-inflicted injury as

13

defined by the Policy. D. 63 at 15. Ms. Wightman, on the other hand, asserts that the autoerotic asphyxiation Dr. Wightman intended was only noninjuries hypoxia which is not an injury precluding recovery. D. 61 at 12-14.

Ms. Wightman relies upon two cases to argue that the exclusion does not apply in this instance: Padfield v. AIG Life Ins. Co., 290 F.3d 1121 (9th Cir. 2002) and Critchlow, 378 F.3d at 258. D. 61 at 16. Both cases considered whether insurance policy exclusions for intentionally self-inflicted injury applied to autoerotic asphyxiation.[2] Padfield, 290 F.3d at 1121; Critchlow, 378 F.3d at 258. Both held that partial strangulation was not an injury that precluded recovery under accidental death policies. Padfield, 290 F.3d at 1129; Critchlow, 378 F.3d at 256. The cases distinguished between the act of initial strangulation for pleasure and the strangulation that caused death. Padfield, 290 F.3d at 1129; Critchlow, 378 F.3d at 260. The court in Padfield explained that the decedent intended the "temporary deprivation of oxygen, a euphoric light-headedness . . . and an intensified sexual experience" but not the death that resulted from the blood flow cut off for a sustained period. Padfield, 290 F.3d at 1129. Under this analysis, the court in Padfield explained that while the initial partial strangulation for pleasure was not an injury but rather a state of "euphoric light-headedness," the strangulation that caused the decedent's death was. Padfield, 290 F.3d at 1129.

Having made the distinction between the initial strangulation for temporary deprivation of oxygen and euphoric light-headedness, the courts applied a "subjective/objective analysis" asking first whether the decedent "subjectively lacked an expectation of death or injury, and second, if

---

[2] While other courts have addressed this issue, many have done so under an abuse of discretion standard of review. See e.g., Estate of Thompson v. Sun Life Assurance Co. of Can., 354 Fed. App'x 183, 186 (5th Cir. 2009) (affirming the denial of benefits under the abuse of discretion review of the administrative record). .

14

so, whether the suppositions that underlay that expectation were reasonable." Critchlow, 378 F.3d at 257-59. Under this standard, if the decedent subjectively only intended to inflict an oxygen deprived euphoric state, and not further injury, and this expectation was objectively reasonable, then the intentionally self-inflicted injury exclusions did not apply. Padfield, 290 F.3d at 1129; Critchlow, 378 F.3d at 258-59. Critchlow and Padfield, however, are unavailing in this instance for two reasons. First, the distinction between the initial strangulation and the strangulation that caused Dr. Wightman's death is artificial. Second, in any event, Dr. Wightman's expectation that he would only inflict an oxygen deprived euphoric state and not further injury was unreasonable in this instance.

        a)       <u>Autoerotic Asphyxiation Is One Continuous Act and Even Partial Strangulation Is an Injury</u>

The Seventh Circuit recently considered this issue and rejected the distinction between the initial strangulation for pleasure and that which causes death. Tran, 922 F.3d at 384. In Tran, the Seventh Circuit rejected the reasoning of Padfield and Critchlow that "artificially separates one continuous act [autoerotic asphyxiation] into two or more parts." Tran, 922 F.3d at 384 (citing Padfield, 290 F.3d at 1123-24; Critchlow, 378 F.3d at 250). There, the court explained that decedents who engage in autoerotic asphyxiation which causes death do not "strangle [themselves] in a nonlethal manner, then involuntarily shift into a different form of lethal strangulation," rather, they intentionally restrict the oxygen to their brain through self-strangulation which gradually causes the loss of consciousness and then death. Id.

Similarly, here, Dr. Wightman's auto asphyxiation was one continuous act. There is no line between the initial partial strangulation Dr. Wightman intended and the continued asphyxiation that caused him to lose consciousness and ultimately die. There was "no intervening cause, and no break in the chain of causation: one act of autoerotic asphyxiation caused the

15

hypoxia that killed" Dr. Wightman.  Id.   Absent the initial autoerotic asphyxiation, Dr. Wightman never would have "experienced hypoxia (and euphoria), lost consciousness, and died."  Id.  When an individual purposely places a belt around his neck, purposely employs that belt to cut off blood flow, and ultimately dies from the very strangulation which he initiated, that person has died from one continuous self-inflicted injury.  Critchlow v. First UNUM Life Ins. Co. of Am., 340 F.3d 130, 134 (2d Cir. 2003), withdrawn and vacated on reconsideration, 378 F.3d at 246.

Even assuming that this Court could differentiate between the stages of strangulation, the partial strangulation Dr. Wightman sought to inflict is nonetheless an injury as the term is ordinarily understood.  Tran, 922 F. 3d at 384; Lonergan, 1997 WL 34706253, at *5.  In Lonergan, this Court considered this issue in reviewing an accidental death policy with an intentional self-inflicted injury exclusion.  See id. at *3-*5.  There, the Court recognized plaintiff's argument that "injury to the tissue of the neck or brain need not accompany a successful act of autoerotic stimulation. . . . [but found that the decedent] specifically intended to injure himself by partial strangulation which would reduce his oxygen supply. . . [and held] that partial strangulation is an injury in and of itself."  Id. at *5.

As Dr. Hammers explained, "[t]he brain is particularly sensitive to oxygen and often is the most affected organ.  Hypoxia and anoxia can lead to neurological symptoms and even loss of consciousness."  SECURIAN-000501.  Although Dr. Hammers explains that "restoration of adequate oxygen supply to the brain after only a brief hypoxic/anoxic period (seconds)" will result in a return to consciousness and resolution of symptoms without long term injury, longer periods of deprivation may lead to long term impairments and a prolonged period of deprivation (minutes) may result in permanent damage to the brain including death. SECURIAN-000501-02.  The injury

from auto asphyxiation is the same: deprivation of oxygen to the brain, the only difference is the degree of deprivation.

Ms. Wightman urges this Court to consider the state of hypoxia associated with partial strangulation as a noninjury because it can be part of the normal physiology and achieved through "hypoventilation training or strenuous physical exercise." D. 61 at 12. This argument overlooks the Court's obligation to give language in a policy the "plain, ordinary, and natural meaning." Filiatrault v. Comverse Tech., Inc., 275 F.3d 131, 135 (1st Cir. 2001). The state of hypoxia at issue here was not achieved through strenuous exercise or hypoventilation, but rather through partial strangulation and the ordinary meaning of injury encompasses partial strangulation. See Tran, 922 F.3d at 384 (holding that "an ordinary person would consider choking oneself by hanging from a noose to be an injury"). Strangulation when committed against another is undoubtedly an injury. See McIntyre v. United States, 447 F. Supp. 2d 54, 118 (D. Mass. 2006) (explaining that "the strangulation and shooting" of the victim "comprise[s] the 'injury'"). There is no reason to think the word "injury" would be differently defined when it is self-inflicted. Partial strangulation, thus, "continues to be an injury even when self-inflicted." Sigler v. Mut. Benefit Life Ins. Co., 506 F. Supp. 542, 545 (S.D. Iowa), aff'd, 663 F.2d 49 (8th Cir. 1981) (applying Iowa law). The fact that Dr. Wightman intended to commit partial strangulation for pleasure does not change the analysis. As the court in Tran observed, "[s]ome people enjoy harming themselves. That harm is still an injury regardless of its popularity or the pleasure some people may derive from it." Tran, 922 F.3d at 385.

b) <u>Dr. Wightman's Expectation that He Would Only Inflict an Oxygen Deprived Euphoric State and Not Further Injury Was Unreasonable</u>

Even assuming that this Court accepted any artificial distinction between the initial strangulation Dr. Wightman intended and that which eventually caused his death, as this Court explained above, Dr. Wightman's expectation that he would suffer any injury beyond the initial strangulation was unreasonable. Dr. Wightman's safety mechanism worked only insofar as he remained conscious and, as such, it would be unreasonable for even an experienced practitioner of autoerotic asphyxiation to restrict oxygen supply to the point of unconsciousness with an expectation of no further injury.

3. *Disease or Illness Exclusion*

Securian also argues that Ms. Wightman is precluded from recovery under the Accidental Death policy because Dr. Wightman's death was caused by a mental illness and, therefore, falls into the disease or illness exclusion of the Accidental Death policy. D. 63 at 17-19. Because this Court has already held that recovery is precluded under both the definition of coverage and the intentional self-inflicted injury exclusion, it does not reach whether the disease or illness exclusion might also preclude recovery.

**V. Conclusion**

For the foregoing reasons, the Court DENIES Ms. Wightman's motion for summary judgment, D. 60, and ALLOWS Securian's motion, D. 63.

**So Ordered.**

/s/ Denise J. Casper
United States District Judge